UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL COLOMB and JONI COLOMB,<br>　　　　Plaintiffs<br><br>　　v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK,<br>　　　　Defendant | No. 21 CV 3449<br><br>Judge Jeremy C. Daniel |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Colomb, an employee of CBRE, Inc. ("CBRE") injured his hand while repairing an anti-terrorism barrier in the parking lot of Union Station in Chicago, Illinois. Colomb and his wife, Joni,[1] filed this action against Defendant National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak") alleging that Amtrak's negligence as owner of Union Station caused his injuries. Amtrak now moves for summary judgment on Colomb's negligence and premises liability claims. (R. 95.)[2] For the reasons that follow, the Court denies the motion.

---

[1] The Court uses "Colomb" throughout this opinion in reference to both Colomb and his wife.

[2] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## BACKGROUND[3]

Amtrak is a national railroad company created and incorporated by Congress. (Def.'s SOF ¶ 1.)[4] It owns the commuter rail terminal in Chicago's West Loop known as Union Station. (*Id.*) Opened in 1925 and designed by legendary architect, Daniel Burnham, Union Station is a central hub of Amtrak's long-distance train service, and a primary transit point for the Chicago Metra commuter rail service. (*Id.* ¶ 6; *see also* R. 97-4 at 32.) As of 2012, Union Station was the third-busiest rail terminal in the United States, serving approximately 130,000 commuters each weekday and 31.6 million passengers annually. (R. 97-4 at 32.)

In 2011, Amtrak purchased and installed a Delta 501 Phalanx security barrier to secure Union Station and prevent acts of terrorism. (Pl.'s SOAF ¶ 6.) The wedge-shaped barrier weighs over 5,000 pounds and can stop a 65,000-pound truck travelling at fifty miles per hour when raised. (*Id.* ¶ 2.) It is raised and lowered through interfacing hydraulic, mechanical, and electrical systems. (R. 64 ¶ 10.) The barrier is embedded into the roadway entrance to the Union Station parking lot through a concrete foundation and reinforced steel. (Pl.'s SOAF ¶¶ 3, 4.)

---

[3] The Court takes its description of the facts from the parties Local Rule 56.1 statements (*see* Amtrak's Statement of Facts ("Def.'s SOF"), R. 97; Plaintiff's Statement of Additional Facts ("Pl.'s SOAF") R. 103; Plaintiff's Response to Amtrak's Statement of Facts ("Pl.'s Resp. to Def.'s SOF") R. 104; Amtrak's Response to Plaintiff's Statement of Additional Facts ("Def.'s Resp. to Pl.'s SOAF") (R. 106)), the evidence cited therein, and all other aspects of the record in this case. Facts are genuinely undisputed unless otherwise noted.

[4] Because the United States owns more than 50% of the capital stock of Amtrak, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1349. *Adkins v. Ill. Central Railroad Co.*, 326 F.3d 828, 848 (7th Cir. 2003).

Although it owns Union Station, Amtrak delegates day-to-day maintenance and upkeep to independent contractors. In 2013, it hired US Equities Asset Management, LLC to perform operation and maintenance services. (Def.'s SOF ¶ 7.) The agreement was memorialized in a services contract dated May 1, 2013 (the "Service Agreement"). (R. 97-4.) CBRE, Plaintiff Michael Colomb's employer, later assumed the Services Agreement and became subject to its terms. (Def.'s SOF ¶¶ 2, 8.)

The Service Agreement provides that CBRE is an independent contractor and its workers are not employees of Amtrak. (R. 97-4 at 9.) In broad strokes, the contract delegates responsibility to CBRE for "effective and efficient building operations and maintenance" at Union Station. (*Id.* at 35.) CBRE is required to plan, schedule, and perform all maintenance at Union Station (whether preventative or corrective) as well as perform repair services for Union Station's operating systems. (Pl.'s Resp. to Def.'s SOF ¶¶ 7, 12–14.) Routine maintenance tasks include replacing light bulbs, plunging toilets, changing filters, fixing doors, and changing grease and oil. (*Id.* ¶ 11.) Although the Service Agreement does not address the Delta 501 security barrier specifically, prior to 2019, CBRE and its employees would also perform maintenance on the barrier, by changing its light bulbs and repairing the metal front plate, or "skirt." (*Id.* ¶ 15 R. 97-4; R. 97-15 ("Robinson Dep.") at 18:17, 19:20–20:2.)

This lawsuit arises from an accident involving the barrier that occurred on November 21, 2019. The morning preceding the accident, a CBRE employee named Deveon Bromby struck the barrier with her car as she was entering the Union Station

3

parking lot, causing a bend on the barrier's front skirt. (Def.'s SOF ¶¶ 31, 33.)[5] Mike Berry, CBRE's Chief Engineer, inspected the barrier and decided to take it out of service. (*Id.* ¶¶ 16, 34.) He informed the guards and Amtrak police that the barrier would not be operating. (*Id.* ¶ 35.) He then directed four CBRE engineers—including Colomb, as well as Joe Constantino, Kevin Murphy, and Dan Riordan—to repair the barrier. (*Id.* ¶¶ 37, 47.)

Colomb and his fellow CBRE employees planned to repair the security barrier by removing the front skirt plate and straightening it. (*Id.* ¶ 43.) Before they did so, the men installed safety legs, or braces, on the barrier. (*Id.*) After removing them from a storage location, they attached them to the bottom of the barrier plate and lowered the barrier onto the legs. (*Id.* ¶ 45.) When installing the legs, Berry and Constantino decided not to "bleed down"—or release pressure from—the barrier's hydraulic system. (*Id.* ¶ 47.)

The engineers successfully removed the skirt from the front of the barrier but could not straighten it. (*See* 97-10 ("Berry Dep.") at 20:1–26:11.) They decided to install a new skirt instead. (*See, e.g.*, *id.*) After the skirt was replaced, Colomb began removing the safety braces on the barrier. (Pl.'s Resp. to Def.'s SOF ¶ 48.) He had difficulty and asked his coworker, Kevin Murphy, if the barrier had been raised up. (*Id.*) Murphy told Colomb—mistakenly—that the barrier was in the "up" position. (*Id.*; *see also* R. 97-12 ("Murphy Dep.") at 81:3–14.) However, because the hydraulics had not been bled down, this was not the case. (*See* Pl.'s Resp. to Def.'s SOF ¶ 49.) As

---

[5] Bromby was a defendant in this action but was voluntarily dismissed. (*See* R. 24.)

a result, instead of coming down slowly when the braces were removed, the barrier fell on Colomb's hand, causing a severe and permanent injury and the amputation of his hand. (*See id.*; Def.'s Resp. to Pl.'s SOAF ¶ 1.)

Amtrak investigated the incident and concluded the barrier collapsed because the hydraulics were not bled off, and because CBRE was not trained or qualified to perform barrier work. (Def.'s Resp. to Pl.'s SOAF ¶ 66; R. 97-14 ("Wright Dep.") at 67:4–6.) Following the accident, CBRE decided that its engineers would no longer perform any work on the security barriers at Union Station. (Pl.'s Resp. to Def.'s SOF ¶ 52.) Colomb filed this suit against Amtrak, asserting claims for common law negligence and premises liability. (R. 62.) Amtrak now moves for summary judgment on both claims. (R. 95.) The Court now addresses the merits of that motion.

## LEGAL STANDARD

"Summary judgment is appropriate when there is no genuine dispute of the material facts and 'the record permits only one resolution of the factual issue[s].'" *Beckner v. Maxim Crane Works, L.P.*, 109 F.4th 968, 973 (7th Cir. 2024) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982)); Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). The non-moving party is given

5

the benefit of conflicting evidence and any reasonable inferences. *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022).

## ANALYSIS

### I. NEGLIGENCE

The Court begins with the plaintiffs' negligence claim, which is governed by Illinois law. "In a negligence action, the plaintiff must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from the breach." *Bruns v. City of Centralia*, 21 N.E.3d 684, 688–89 (Ill. 2014) (citation omitted). Here, the only issue is whether Amtrak owed a duty to the plaintiffs.[6] This is a question of law for the court to decide. *Id.* (citing *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227 (Ill. 2007)). "In the absence of a showing from which the court [can] infer the existence of a duty, no recovery by the plaintiff is possible as a matter of law and summary judgment in favor of the defendant is proper." *Id.* (quoting *Vesey v. Chi. Housing Authority*, 583 N.E.2d 538 (Ill. 1991)).

The duty inquiry focuses on "whether [the] defendant and plaintiff stood in such a relationship to one another that the law imposed upon [the] defendant an obligation of reasonable conduct for the benefit of [the] plaintiff." *Ward v. K mart Corp.*, 554 N.E.2d 223, 226 (Ill. 1990). Courts consider four factors in resolving this question: (1) the likelihood of injury, (2) the reasonable foreseeability of injury, (3) the

---

[6] Breach and causation are questions of fact for the trier of fact to decide, provided those questions present genuine issues of material fact. *See Hougan v. Ulta Salon, Cosms. & Fragrance, Inc.*, 999 N.E.2d 792, 797 (Ill. App. Ct. 2013). Amtrak moves solely on the duty element of Colomb's negligence claim and does not dispute that the evidence in the record is sufficient to create a genuine issue of material fact as to breach or causation. (*See* R. 96.)

magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Frieden v. Bott*, 146 N.E.3d 763, 768 (Ill. App. Ct. 2020) (citation omitted). Courts may also consider public policy. *Id.*

As an initial matter, it is undisputed that Colomb was not an Amtrak employee; he was an employee of CBRE, an entity that was classified, pursuant to the Services Agreement, as an independent contractor. (*See* R. 97-4 at 9.) CBRE's independent contractor status is confirmed by provisions in the Agreement showing that Amtrak generally lacked control over the means of CBRE's maintenance work. *See, e.g.*, *Brettman v. M & G Truck Brokerage, Inc.*, 127 N.E.3d 880, 888 (Ill. App. Ct. 2019) (holding that "[t]he court is to consider whether there is a right to control the manner of work performance" in determining whether an employee is an independent contractor). For example, the Services Agreement provides that CBRE "is responsible for selecting qualified personnel to perform the Services," "supervi[sing] all of its employees, monitor[ing] the techniques used in the performance of work, and keep[ing] its employees informed of improvements, changes, and methods of operation." (*Id.* at 12–13.)

The fact that CBRE is an independent contractor makes establishing that Amtrak owed a duty to Colomb an uphill battle—though not impossible. Generally, one who employs an independent contractor is not liable for the acts or omissions of the latter. *Martens v. MCL Const. Corp.*, 807 N.E.2d 480, 488 (Ill. App. Ct. 2004) (citing *Rangel v. Brookhaven Constructors, Inc.,* 719 N.E.2d 174 (Ill. App. Ct. 1999)). "'The reason for distinguishing the independent contractor from the employee is that

7

. . . the principal does not supervise the details of the independent contractor's work and therefore is not in a good position to prevent negligent performance, whereas the essence of the contractual relationship known as employment is that the employee surrenders to the employer the right to direct the details of his work, in exchange for receiving a wage.'" *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 277 (2004) (quoting *Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 938 (7th Cir. 1986)).

Nonetheless, Illinois law recognizes important exceptions to the general rule. Of relevance here is the doctrine of retained control, found in Section 414 of the Restatement of Torts. The Restatement provides that, in circumstances where an entity like Amtrak reserves control over its independent contractor, the hiring entity may nonetheless remain liable for its own negligence:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

*Id.* at 8 (quoting Restatement (Second) of Torts (hereinafter, "Restatement") § 414 (1965)). Generally, the retained control inquiry asks whether the employer controlled the "means and methods" of the contractor's work, such that he was not entirely free to perform the work in his own way. *Martens*, 807 N.E.2d at 490–91. With respect to allegations that a defendant retained control of safety measures, however, the "appropriate question" is not whether the principal controlled the "means and methods" of performing the task, but rather "who contractually and/or physically has the duty to control safety of the project." *Moss v. Rowe Const. Co.*, 801 N.E.2d 612,

8

615 (Ill. App. Ct. 2003); *see also, e.g.*, *Lederer v. Executive Const., Inc.*, 18 N.E.3d 112, 125–26 (Ill. App. Ct. 2014) (citing *Martens*, 807 N.E.2d at 491–92) (holding that an employer who does not retain control over a particular task may nonetheless retain a general duty to control the safety of an independent contractor's work).

Retained control is typically a question of fact for the jury. *Foley v. Builtech Constr., Inc.*, 160 N.E.3d 78, 87 (Ill. App. Ct. 2019); *see also Martens*, 807 N.E.2d at 488 ("The demarcation between retained control and the lack thereof is not clear-cut"). In evaluating whether Section 414's retained control exception applies, the Court begins with the "best indicator" of retained control: the written agreement between Amtrak and CBRE. *Id.* at 87 (quoting *Carney v. Union Pac. R. Co.*, 77 N.E.3d 1, 10 (Ill. 2016)). As stated above, the Service Agreement does not specifically mention the Delta 501 security barrier, CBRE's responsibilities for repairing the barrier, or Amtrak's responsibilities in supervising such repairs. (*See generally* R. 97-4.) Rather, the contract describes CBRE's responsibilities in general terms; providing that CBRE shall be responsible for "providing all facets of corrective maintenance services," including "emergency repairs to equipment," and "reactive engineering repair activities." (*Id.* at 36.)

Colomb points to language in the Service Agreement requiring "joint inspections," "close coordination" between Amtrak and CBRE, and standards for evaluating CBRE's performance as evidence of retained control. (R. 97-4 at 33–44.) The contract conditions payment on the "satisfactory performance by Contractor and Amtrak's acceptance of such performance" and requires CBRE to maintain

9

"acceptable customer satisfaction and performance as evaluated by Amtrak." (*Id.* at 3–4, 45.) Colomb argues that the contract gave Amtrak the right to control who worked on the barriers, and that Amtrak could, pursuant to the agreement, order CBRE employees not to perform maintenance on the barriers or delegate maintenance to specialty contractors. (Pl.'s SOAF ¶¶ 53, 59–61.)

These provisions, standing alone, are insufficient to establish that Amtrak retained control over the means and methods of how CBRE did its work. *Carney v. Union Pacific Railroad* is instructive on this point. 77 N.E.3d at 1. There, the Illinois Supreme Court analyzed whether a contract between a railroad company and a subcontractor who demolished a bridge created a genuine issue of material fact as to retained control. *Id.* at 1–6. The contract required the subcontractor's work to be performed to the satisfaction of the railroad and authorized the railroad to stop the subcontractor's work or make changes. *Id.* at 10–11. Reversing the Appellate Court, the Supreme Court concluded that there was insufficient evidence of retained control, since the contract language described only "the general rights reserved to someone . . . who employs an independent contractor." *Id.*

As in *Carney*, provisions of the Service Agreement that condition performance on Amtrak's satisfaction and acceptance are insufficient to establish that CBRE lacked the ability to do the work in its own way. *See id.* at 11 (quoting Restatement § 414 cmt. c). A general right to stop work is also insufficient to establish a genuine issue as to retained control. *Cockrum v. Kajima Int'l, Inc.,* 645 N.E.2d 917, 921 (Ill. 1994). Nor is the fact that Amtrak took responsibility for investigating the barrier

10

after the fact sufficient to establish a genuine issue of fact—in *Carney*, the majority rejected a similar argument. 77 N.E.3d at 13–14.

But this is not the only evidence in the record. The Services Agreement also contains language suggesting that Amtrak had a right to create and enforce safety measures. It provides that CBRE must "comply fully with any safety requirements (including the requirement to attend safety classes and participate in safety training) *imposed by Amtrak*." (R. 97-4 at 20 (emphasis added)). The contract also states that CBRE's performance will be evaluated based on "compliance with Amtrak[] Safety Procedures." (*Id.* at 35.)

In assessing retained control, the Court may also consider evidence outside the four corners of the parties' agreement. *Carney*, 77 N.E.3d at 10. Colomb identifies an Amtrak Lockout/Tagout/Tryout ("LOTO") policy specifying safety procedures to be used when working on equipment "that contains hazardous energy." (R. 103-11.) The policy applies to "hydraulic hazards" such as "moving parts that could result in being struck, crushed, or pinched." (*Id.* at 4.) It states that Amtrak is responsible for "implement[ing] the requirements (*i.e.* training, oversight) under this process for both employees *and contractors*." (*Id.* at 1 (emphasis added).) And while the policy states that "Contractors may use their own LOTO program," it includes a caveat that the policy must "meet[] or exceed[] requirements as specified in this process," and that the "Amtrak manager responsible for the contract is responsible for ensuring compliance." (*Id.* at 7.) CBRE manager Ryan Haar testified that Amtrak safety manager Jeffrey Wright was responsible for ensuring compliance with safety

11

procedures, but it is disputed whether he did so. (*See* R. 97-10 ("Haar Dep.") at 34:1–36:1; Def.'s Resp. to Pl.'s SOF ¶¶ 50–51.)

This evidence makes the present case distinguishable from *Carney*, where the railroad retained only a "general right to enforce safety" over the subcontractor performing the bridge demolition. *Carney*, 77 N.E.3d at 11. Whereas the agreement in *Carney* made the subcontractor responsible for "keep[ing] the job site free from safety and health hazards and ensur[ing] that its employees [were] competent and adequately trained in all safety and health aspects of the job," *id.*, the Services Agreement does not contain a comparable delegation of safety responsibilities to CBRE. To the contrary, both the Service Agreement and the LOTO policy indicate that safety policies would be developed and imposed *by Amtrak*, and that Amtrak would evaluate CBRE's compliance with them. (R. 97-4 at 20, 35.) Viewing this evidence in the light most favorable to Colomb, reasonable minds could disagree as to whether Amtrak's safety policies "sufficiently affected" CBRE's "means and methods of doing its work" so as to bring them "within the ambit of the retained control exception." *Martens*, 807 N.E.2d at 492 (citations omitted).

In its reply brief, Amtrak argues that there is no evidence that the LOTO policy was ever communicated to CBRE or that CBRE was required to abide by it. (R. 105 at 5.) But the Court must draw all inferences in Colomb's favor. *Runkel*, 51 F.4th at 741. Even if Amtrak never informed CBRE of the policy, this does not mean that it did not retain the ability to enforce compliance with it. Again, the Service Agreement makes *Amtrak*, not CBRE, responsible for imposing safety measures and evaluating

12

contractors' conformity with them. While the LOTO policy permits contractors like CBRE to implement their own policies for operating hazardous equipment, Amtrak must ensure that the policies "meet or exceed[]" the LOTO policy's requirements. (R. 103-11 at 7.) Amtrak presents no evidence that it did so. *Compare*, *Martens* 807 N.E.2d at 491–92 (holding that the defendant did not retain control over a sub-subcontractor with respect to general safety directives because the evidence showed that the parties had reached an agreement to deviate from them); *see also Lederer*, 18 N.E.3d at 127 (denying summary judgment in part because there was no evidence that the subcontractor obtained a "specific exception" to the general contractor's safety rules).

There is another important distinction between *Carney* and this case. In *Carney*, it was undisputed that the subcontractor that performed the demolition work was generally qualified to do so. *See* 77 N.E.3d at 15 ("The record discloses that Carney group did have extensive experience in bridge demolition."). Here, by contrast, Amtrack's investigation concluded that CBRE and its personnel lacked experience in operating hydraulics or repairing security barriers. (*See* Def.'s Resp. Pl.'s SOAF ¶¶ 21, 66.)

The Delta 501 security barrier is unique, not conventional, and not typically found in other buildings that CBRE worked on. (*Id.* ¶ 9.) It is also dangerous if handled improperly. A safety manual—which was in Amtrak's possession and CBRE never received—describes the barrier as "a powerful hydraulic press that can easily crush anything in [its] way," and provides that "[p]articular attention should be paid

13

to the danger of working on the Barrier when the power is on." (R. 103-4 at 1.) Colomb presents the expert testimony of mechanical engineer, John Green, and OSHA compliance expert, Peter Engelbert, who each testified that due to the dangerous, complex, and unique nature of the safety barriers, maintenance and repairs should only be performed by specially trained service personnel. (*See* Pl.'s SOAF ¶ 10.)[7] Indeed, Amtrak knew that specialty contractors had previously been hired for barrier maintenance. (Def.'s Resp. to Pl.'s SOAF ¶ 62.) But it never inquired whether CBRE had experience or training to perform the work itself. (*Id.* ¶ 67.)

In the Court's view, both the dangerousness of the barrier and CBRE's lack of qualifications in operating hydraulic equipment are relevant in assessing whether Amtrak retained control of safety measures. Comment a of Restatement Section 414 states that a principal remains liable for an independent contractor's actions if he "retain[s] [] the power . . . to forbid [the work] being done in a manner likely to be dangerous to himself or others." Restatement § 414, cmt. a; *see also Moss*, 801 N.E.2d at 615. Comment b indicates that liability may attach if the principal "knows or by the exercise of reasonable care should know that the subcontractor's work" is being done in a dangerous manner and "has the opportunity to prevent it by exercising the power of control which he was retained in himself." Restatement § 414, cmt. b.

---

[7] Amtrak argues that Green and Engelbert's testimony should be ignored because duty is a question of law and experts cannot testify as to legal conclusions. *See, e.g.*, *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Green and Engelbert's testimony regarding the dangerousness of the safety barrier and the level of training required to perform repairs are not legal conclusions, however. At this stage, the Court considers their testimony for the limited purpose of determining whether the safety barrier imposed a foreseeable danger.

A reasonable jury could conclude that Amtrak retained control of safety oversight with respect to the barrier repair—not simply because Amtrak had the ability to stop CBRE's work (as in *Carney*)—but because the Service Agreement and LOTO policy indicate that Amtrak had the ability to prevent the barrier repair from being done in a dangerous manner, and because Amtrak had reason to know that CBRE was not qualified to perform the repairs itself.

Finally, Amtrak claims that it was unaware that CBRE was performing maintenance on the barrier. (R. 96 at 11–14.) This, too, is disputed. Although Wright, Amtrak's safety manager, stated that he was unaware CBRE was performing repair work, Amtrak's facility manager, Michael Henessy, admitted that he saw CBRE employees changing lightbulbs on the barriers. (Pl.'s SOAF ¶ 15 (citing R. 97-6 ("Henessy Dep.") at 16:1–18:24, 69:1–70:24.) Henessy conducted joint inspections for quality assurance alongside CBRE employee Steven Trubich, who testified that Amtrak would have known that CBRE was repairing the barriers based on their conversations. (Def.'s Resp. to Pl.'s SOAF ¶ 37 (citing Henessy Dep. at 42:3–43:11); R. 97-9 ("Turbich Dep.") at 79:9–80:16), ¶ 64 (citing Turbich Dep. at 113:18–115).)[8] Finally, Matt Robinson, an Amtrak foreman, testified that he participated in barrier work with CBRE employees. (*Id.* ¶ 33; Robinson Dep. at 18:17, 19:20–20:2.)

---

[8] Amtrak objects to Trubich's testimony as hearsay or speculation. (*See* Def.'s Resp. to Pl.'s SOAF ¶ 64.) But it does not identify an out of court statement offered to prove the truth of the matter asserted. (*See id.*); Fed. R. Evid. 801(c)(2). Admissions made by Henessy in the scope of his employment may be imputed to Amtrak, his employer, as an opposing party. *See Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003); Fed. R. Evid. 801(d)(2)(D). And Trubich has personal knowledge of his conversations with Henessy and may testify as to the contents of those conversations. *See* Fed. R. Evid. 602.

15

In sum, a reasonable jury could conclude that Amtrak retained control to enforce safety measures in connection with barrier maintenance and had notice that CBRE was repairing the barriers in an unsafe manner. Amtrak's motion for summary judgment on Colomb's negligence claim is therefore denied.

## II.    PREMISES LIABILITY

The Court next turns to Colomb's premises liability claim. This claim is evaluated pursuant to § 343 of the Restatement, which states:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

*Carney*, 77 N.E.3d at 19 (quoting Restatement § 343). Amtrak raises three arguments in support of summary judgment: that Colomb's injury was caused by CBRE's own negligence as opposed to a "condition on the land"; that there is no evidence of proximate cause; and that Amtrak did not have notice of the damaged barrier prior to Colomb's injury.

First of all, it is undisputed that the Delta 501 security barrier is a "condition on the land." The barrier was embedded into the ground outside of the Union Station parking lot with reinforced steel and concrete. (Pl.'s Resp. to Def.'s SOF ¶ 4.). Illinois case law defines "conditions on the land" capaciously in reference to a variety of man-made and naturally occurring hazards. *See, e.g.*, *Hutson v. Pate*, 216 N.E.3d 1085, 1094 (Ill. App. Ct. 2022), *appeal denied,* 199 N.E.3d 1196 (Ill. 2022) (collecting cases);

16

*see also* Restatement § 343, cmt. f (indicating that "appliances" used on the land fall within the provision's scope).

Amtrak instead argues that Colomb's premises liability claim is based on CBRE's negligence rather than the damaged barrier. While several Illinois cases have explored the difference between premises liability claims and "active negligence," *see Hutson*, 216 N.E.3d at 1094–95, the cases that rest on this distinction—particularly the ones cited by Amtrak—are distinguishable. For example, Amtrak relies on *Recio v. GR-MHA Corporation*, where a plaintiff sought recovery under a premises liability theory for falling while carrying a bundle of shingles up a ladder. 851 N.E.2d 106, 119 (Ill. App. Ct. 2006). After musing whether the plaintiff's injury was caused by "an activity on the land" for the purposes of Restatement Section 343, the Appellate Court ultimately concluded that the owner of the premises did not have actual or constructive knowledge of the unsafe situation. In other words, the case did not turn on a distinction between a condition on the land and active negligence.

In *Hodges v. Archer Daniels Midland Company*, the district court rejected the plaintiff's premises liability theory because it was not pleaded in the complaint, and the plaintiff could not "amend his complaint through arguments in his brief in opposition to a motion for summary judgment." 474 F. Supp. 3d 956, 975 (C.D. Ill. 2020) (quoting *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012)). Before dismissing the premises liability claim, the Court noted in passing that the theory was a poor fit because the plaintiff's employer, rather than the landowner, had brought the hose that caused his injury onto the property. *Id.*

17

Finally, in *Schaefer v. Universal Scaffolding & Equipment, LLC*, the Seventh Circuit held that the plaintiff waived a premises liability theory by failing to develop it in her briefing. 839 F.3d 599, 607 (7th Cir. 2016). In *dicta*, the Seventh Circuit noted that the plaintiff's theory—which related to defective scaffolding—did not relate to a condition on the land because the scaffolding had been assembled on the job site by an independent contractor. *Id*. However, the Seventh Circuit also noted that "already-assembled scaffolding," "could arguably be a condition on the land." *Id*.

Here, Colomb's premises liability claim has not been procedurally defaulted, and determining whether his injuries were caused by a condition on the land or active negligence is less clear-cut. Unlike the scaffolding in *Schaefer*, the hose in *Hodges*, or the ladder in *Recio*, the security barrier was not constructed, assembled, or brought to the job site by CBRE, but was fixed in the ground by Amtrak years before CBRE contracted to perform maintenance services at Union Station. A jury could conclude that Colomb's injury was caused by Amtrak's failure to address the broken barrier (as opposed to CBRE's own abortive repair attempt).

Viewed in this way, Amtrak's argument is really about causation: whether CBRE's own negligence as opposed to the conditions of the barrier brought about Colomb's injury. But causation is a question of fact that cannot be resolved given the disputed evidence in the record. *See, e.g.*, *LoBianco v. Bonefish Grill, LLC*, 94 F.4th 675, 677 (7th Cir. 2024) (collecting cases). It is for the jury to decide whether Berry's directive to repair the barrier, as opposed to Amtrak's failure to intervene and take corrective action, was the proximate cause, or a substantial factor in bringing about

Colomb's injury. *See, e.g., Reyes v. Menard, Inc.*, No. 21 C 359, 2022 WL 2757666, at *4 (N.D. Ill. July 14, 2022); *Inman v. Howe Freightways, Inc.*, 130 N.E.3d 458, 476 (Ill. App. Ct. 2019).

Moreover, although Colomb's premises liability claim shares similarities with his ordinary negligence claim, the two claims are not duplicative. In "circumstances where a landowner's conduct in creating an unsafe condition precedes the plaintiff's injury, a plaintiff may elect to pursue a negligence claim, a premises liability claim, or both . . ., so long as evidence supports such a theory." *Martin v. City of Chi.*, 229 N.E.3d 986, 993 (Ill. App. Ct. 2019); *Clifford v. Wharton Bus. Grp., L.L.C.*, 817 N.E.2d 1207, 1213 (2004) ("[S]ections 343 and 414 [of the Second Restatement] are not mutually exclusive; rather, each one offers an independent basis for recovery.").

Finally, Amtrak argues that it did not have notice of the hazardous condition. There is, at minimum, a genuine issue of material fact here as well. *See Hornacek v. 5th Ave. Prop. Mgmt.*, 959 N.E.2d 173, 183 (Ill. App. Ct. 2011) ("Notice is generally a question of fact for the jury to decide."). After Bromby's car hit the barrier, Berry informed Amtrak police of his decision to take the barrier out of service. (Def.'s SOF ¶ 35.) At least one Amtrak truck and one Amtrak police officer passed by the barrier after it was damaged, and the Amtrak police officer was filmed standing between the workers and the car which struck the barrier. (*See* Def.'s Rep. to Pl.'s SOAF ¶ 17.) Finally, as stated above, various parties testified that Amtrak was aware that CBRE performed maintenance on the barrier. From this evidence, jurors could reach conflicting conclusions as to whether Amtrak was aware of the hazard. Amtrak's

motion for summary judgment is therefore denied as to Colomb's premises liability claim as well.

## CONCLUSION

Defendant National Railroad Passenger Corporation d/b/a Amtrak's motion for summary judgment is denied. On or before September 27, 2024, the parties shall submit a joint status report indicating the anticipated length of trial and their availability for trial in June or July 2025.

Date: September 10, 2024

JEREMY C. DANIEL
United States District Judge